STATE OF LOUISIANA

VERSUS

DAMON STEPHNEY

NO. 19-KA-77

FIFTH CIRCUIT

COURT OF APPEAL

STATE OF LOUISIANA

ON APPEAL FROM THE TWENTY-FOURTH JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON, STATE OF LOUISIANA
NO. 17-1656, DIVISION "E"
HONORABLE MICHAEL E. KIRBY, JUDGE PRO TEMPORE, PRESIDING

February 28, 2024

**JUDE G. GRAVOIS**
**JUDGE**

Panel composed of Judges Jude G. Gravois,
Marc E. Johnson, and Timothy S. Marcel

**CONVICTION AFFIRMED; HABITUAL OFFENDER ADJUDICATION
AND ENHANCED SENTENCE VACATED; ORIGINAL SENTENCE
REINSTATED; REMANDED**

    **JGG**

    **MEJ**

    **TSM**

FIFTH CIRCUIT COURT OF APPEAL
A TRUE COPY OF DOCUMENTS AS
SAME APPEARS IN OUR RECORDS

Jalisa Walker
Deputy, Clerk of Court

COUNSEL FOR PLAINTIFF/APPELLEE,
STATE OF LOUISIANA
        Honorable Paul D. Connick, Jr.
        Thomas J. Butler
        Darren A. Allemand
        Rachel L. Africk
        Seth W. Shute

COUNSEL FOR DEFENDANT/APPELLANT,
DAMON STEPHNEY
        James A. Williams
        Mary V. Hicks
        Kathrine E. Ellis

**GRAVOIS, J.**

Defendant, Damon Stephney, appeals his conviction and sentence for aggravated burglary, a violation of La. R.S. 14:60. On appeal, defendant argues the following assignments of error:

(1) The trial court erred in denying defendant's motion for a continuance;

(2) The trial court erred in admitting co-defendant Wendell Garcia's statement, which was hearsay, into evidence;

(3) The evidence presented at trial was insufficient to sustain defendant's conviction;

(4) The trial court erred in denying defendant's motion to reconsider his excessive enhanced sentence;

(5) The trial court erred in denying defendant's motion for a new trial; and

(6) The trial court erred in denying defendant's motion for a new trial based on newly discovered evidence [supplemental assignment of error].

For the following reasons, we find that defendant's assignments of error are without merit. Accordingly, we affirm defendant's conviction. However, as explained below, due to a patent error, we vacate defendant's habitual offender adjudication and enhanced sentence, reinstate defendant's original sentence, and remand the matter to the trial court for further proceedings.

## PROCEDURAL HISTORY

On May 2, 2017, the Jefferson Parish District Attorney filed a bill of information charging defendant, Damon Stephney, with aggravated burglary, in violation of La. R.S. 14:60 (count one),[1] and possession of a firearm by a convicted felon, in violation of La. R.S. 14:95.1 (count two). Defendant was arraigned on that same date and pled not guilty as to both counts. On September 17, 2018, the State severed count two and the case proceeded to trial as to count one before a

---

[1] In that same bill of information, the State also charged Damon Garcia, Wendell M. Garcia, and Phillip Brenckle, Jr. with aggravated burglary in count one. On August 20, 2018, the State amended the bill of information to charge Damon Garcia with accessory after the fact to aggravated burglary, in violation of La. R.S. 14:60 and La. R.S. 14:25.

twelve-person jury.  On September 21, 2018, the jury unanimously found defendant guilty as charged as to count one.

On October 9, 2018, the State filed a habitual offender bill of information alleging defendant to be a third-felony offender.[2]  On October 15, 2018, defendant filed a "Notice of Objections to Multiple Bill," a "Motion to Reconsider Sentence," and a "Motion for Appeal."  On October 18, 2018, defendant filed a "Motion for New Trial" and a "Motion for New Trial and Motion for Judgment Notwithstanding the Verdict," which were denied on October 22, 2018.  Afterwards, on October 22, 2018, defendant waived sentencing delays, and the trial court sentenced him to imprisonment at hard labor for thirty years.  The trial court then denied defendant's Motion to Reconsider Sentence.  Thereafter, on that same day, a hearing was held on the habitual offender bill of information, and the trial court adjudicated defendant a third-felony offender.  The trial court then vacated defendant's original sentence, resentenced defendant under the habitual offender statute to imprisonment at hard labor for forty-five years, and granted defendant's appeal.  On November 15, 2018, the State dismissed count two of the bill of information.

Defendant appealed and filed his original brief.  While the appeal was pending, on September 20, 2019, defendant filed a "Motion for New Trial" based on newly discovered evidence.  On October 3, 2019, this Court remanded the case to the trial court for a hearing on the "Motion for New Trial" based on newly discovered evidence and stayed the appeal pending resolution of the motion.  The trial court denied the motion after a hearing on July 6, 2023.  On September 11, 2023, this Court lifted the stay and allowed defendant time to file a supplemental

_____

[2] In the habitual offender bill of information, the State alleged that defendant had two prior convictions: 1) on January 5, 2011, defendant pled guilty to possession of cocaine, in violation of La. R.S. 40:967, and was sentenced to three years at hard labor; and 2) on January 20, 2005, defendant pled guilty to obscenity, in violation of La. R.S. 14:106, and was sentenced to one year and ten months at hard labor.

brief limited to the issues raised in the "Motion for New Trial" based on newly discovered evidence. On October 17, 2023, defendant filed a supplemental brief in this Court.

## FACTS

At trial, the State presented evidence to show that Damon Stephney (defendant), Damon and Wendell Garcia (defendant's sons),[3] Phillip Brenckle, Jr., and Phillip Brenckle, Sr. committed an aggravated burglary of 409 Oaklawn Drive in Metairie, where Brandon Brupbacher, Chad Brassette, and Homer Zometa resided. The State introduced evidence to show that two armed perpetrators, defendant and Phillip Brenckle, Jr., entered the residence while wearing masks and gloves, Wendell stayed outside and acted as a lookout, and Damon acted as the getaway driver.[4] At the time of the offense, Lyndon Yerro was visiting Mr. Brupbacher, his boyfriend, and was shot outside the residence while trying to escape. In an attempt to prove the identity of all of the perpetrators, the State presented the testimony of Wendell and Damon, video surveillance footage, and expert testimony regarding DNA and ballistics as to evidence found in the area surrounding 409 Oaklawn Drive. The defense argued that there was no evidence that defendant committed the crime.

Nancy Clary, the custodian of records for the Jefferson Parish Sheriff's Office ("JPSO") 9-1-1 call center, testified that on March 5, 2017, from 8:22 p.m. to 8:48 p.m., the JPSO received numerous 9-1-1 calls from the area surrounding the 400 block of Oaklawn Drive in Metairie.

JPSO Deputy Patrick Fonte testified that on March 5, 2017, at approximately 8:30 p.m., he arrived in the area of 409 or 415 Oaklawn Drive in response to the

---

[3] Because Damon Stephney and Damon Garcia are both named "Damon," Mr. Stephney will be referred to as "defendant" in this opinion, and his son will be referred to as "Damon."

[4] The jury was instructed regarding the law of principals, among other things.

9-1-1 calls. He saw a victim, later identified as Mr. Yerro, lying in the driveway of 415 Oaklawn Drive with an apparent gunshot wound. He also noticed a male, later identified as Mr. Brupbacher, with his hands over Mr. Yerro's abdomen applying pressure. He waited with Mr. Yerro until EMS arrived. In the meantime, officers arrived at the scene and in the surrounding areas, a perimeter was set up, and statements were obtained from the victims regarding the details of the offense.

Mr. Yerro testified that in March 2017, he and Mr. Brupbacher were dating.[5] Mr. Brupbacher owned the house at 409 Oaklawn Drive and Mr. Brassette and Mr. Zometa were his roommates. On March 5, 2017, he was driving down Oaklawn Drive on his way to visit Mr. Brupbacher when he saw three "guys" walking on the left-hand side of the street towards the interstate (I-10). This was suspicious to him because he had never seen such a group of people just strolling down Oaklawn Drive. When he arrived after 8:00 p.m., he parked on the lawn, exited his vehicle, and knocked on the front door. When he looked behind him at his lawn chairs, which were in the front yard, he saw the three guys crossing to his side of the street. He then picked up his lawn chairs and put them in his trunk.

Mr. Yerro testified that he got nervous and texted or called Mr. Brupbacher, asking him to open the door. He walked back to the front door, looked behind him, and saw the three guys standing underneath the neighbor's tree on the sidewalk. He became very alarmed and worried. He knocked on the door and Mr. Brupbacher answered it. He told Mr. Brupbacher that he thought three guys were following him. He entered the house, passed Mr. Brupbacher, and walked towards the dining room. When he turned around, he saw Mr. Brupbacher trying to close the door and two guys on the other side of the door were trying to push it open.

---

[5] Lyndon Yerro testified that at the time of the burglary, he was known as "Nicky," he identified as a female, he "clearly" presented as a female, and he used female pronouns. At trial, different witnesses referred to Lyndon Yerro as "him" and "her." However, because it appears that he identified as a male at trial, he will be referred to in this opinion with male pronouns or as "Mr. Yerro."

The two guys had hoods on as well as masks. The two guys came into the house; they both had guns. He ran out the back door, opened the side gate, and ran down Oaklawn Drive towards Veterans Boulevard screaming for help.

As he was running, Mr. Yerro heard gunshots and fell to the ground. He got up and knocked on the doors of a house, after which he heard two more gunshots. He ran towards the front near the sidewalk, after which he saw Mr. Brupbacher, Mr. Brassette, and Mr. Zometa running out of the house at 409 Oaklawn Drive. He yelled at Mr. Brupbacher that he (Mr. Yerro) had been shot and Mr. Brupbacher came over to help him. EMS later arrived and took him to the hospital where he stayed for five days. He sustained entrance and exit wounds on his left arm and stomach area. The doctor had to remove a kidney and repair his liver and he still had scars. When he was released from the hospital, he spoke to the police. He told them that he was not aware that there were drugs in the house at 409 Oaklawn Drive.

Mr. Brupbacher testified that on March 5, 2017, at approximately 8:30 p.m., he, Mr. Brassette, and Mr. Zometa were in Mr. Brassette's bedroom watching a movie when he heard knocking on the front door. He opened the front door and Mr. Yerro was there. Mr. Yerro was standing close to the front door and said that the people in the yard were following him. He saw an individual standing by the tailgate of Mr. Brassette's truck less than ten feet from the front door. He asked this person if he was looking for someone, but the person did not respond. He was about to close the door when the individual quickly approached the door. When the individual got close to the door, he saw that the individual was wearing a mask. Another individual then jumped from the front of the house to the door. He tried to shut the door, but was unable to do so, and both individuals came inside the house.

Mr. Brupbacher stated that he saw a mask on the other individual once they came inside the house. They were both wearing dark hoodies or hooded

sweatshirts with the hoods pulled up. He was able to see that one perpetrator was African-American and the other perpetrator was Caucasian. He also noticed that both men were armed with black handguns. The first perpetrator who came in pointed the gun at him. Mr. Brassette and Mr. Zometa came into the living room to see what was going on. The perpetrators told all of them to get on the ground and empty their pockets. He identified his wallet, cigarettes, and loose "junk" from his pockets in a photograph entered as a State exhibit. He had $1,000 in cash in his wallet because Mr. Brassette and Mr. Zometa had just paid him rent that night, but the cash was not taken.

Mr. Brupbacher testified that one of the perpetrators walked towards the back of the house and instructed the other perpetrator to tie them up. One of the perpetrators produced a black bag with some thick zip ties inside. He did not recall whether the perpetrators wore gloves. As soon as one of the perpetrators pulled the zip ties out, he heard three or four bangs on the front door. Both perpetrators looked at each other and then asked him who was at the door. He told them that he did not know. One perpetrator then ducked behind a wall and the other perpetrator backed up towards the kitchen. He subsequently ran to the front door, opened it, and yelled to Mr. Brassette and Mr. Zometa to run, after which they all ran out the front door. He and Mr. Brassette ran across the street to their neighbor's house, banged on the door, and asked the neighbor to call 9-1-1. Mr. Zometa hid behind a neighbor's car across the street.

Mr. Brupbacher heard Mr. Yerro yelling that he had gotten shot, so he went to Mr. Yerro, who was lying on his neighbor's sidewalk two doors down from his house. He saw that Mr. Yerro was "bleeding out," so he applied pressure to Mr. Yerro's arm. Several neighbors came outside and called 9-1-1. He also called 9-1-1 and spoke to an operator. The police and an ambulance later came to the scene. He cooperated in the investigation. At the time of the offense, he had a

shotgun in his bedroom and a pistol in his car. The police later came to his house with a search warrant and found firearms in his house.

The police did not find narcotics in Mr. Brupbacher room, but they found narcotics in Mr. Brassette and Mr. Zometa's rooms. Mr. Brupbacher acknowledged that Mr. Brassette and Mr. Zometa smoked marijuana in their rooms. He did not sell drugs and did not know of Mr. Brassette and Mr. Zometa selling drugs. Nothing was stolen from the house that night.

Mr. Brassette also testified. His testimony was similar to that of Mr. Brupbacher. However, Mr. Brassette testified that he was "pretty sure" the perpetrators were wearing gloves. He gave the perpetrators eighty dollars. Also, the police found forty-four grams of marijuana, eleven grams of cocaine, and "mushrooms" (psilocybin) in his room. He was charged with possession with the intent to distribute those drugs and went to jail. He ultimately pled guilty to the reduced charge of possession of those drugs and received probation. He did not receive a deal in exchange for his testimony. He claimed that the drugs found in his room were for his personal use.[6] He did not know any of the perpetrators in the instant case or why they chose his house. The perpetrators did not take any of their wallets or any drugs.

Mr. Zometa also testified. His testimony was similar to that of Mr. Brupbacher and Mr. Brassette. However, he explained that on March 5, 2017, he and Mr. Brassette were watching a movie in Mr. Brassette's room and Mr. Brupbacher was in the living room watching television before the perpetrators entered the house. The police later found marijuana in his room. He never saw Mr. Brassette selling drugs. The perpetrators only took Mr. Brassette's money and did not take guns or drugs.

---

[6] Mr. Brassette admitted that in 2015, he was arrested for possession with the intent to distribute marijuana and mushrooms, and, in connection therewith, completed diversion.

Additionally, several police officers testified regarding evidence that they found in the area surrounding 409 Oaklawn Drive. Deputy Fonte testified that a .40-caliber Smith and Wesson casing was found in the driveway of 415 Oaklawn Drive.

JPSO Deputy David Webster testified that on March 5, 2017, he responded to the intersection of Toulouse Street and Rosa Avenue in Metairie, which was one block east of Oaklawn Drive. He exited his marked unit, walked around, and saw a black hat/baseball cap and a mask at 530 Rosa Avenue. As he walked towards the hat, he saw a pistol magazine[7] and a barrel from a gun sticking out from underneath a car at 530 Rosa Avenue. The magazine typically went with a 9-mm Glock handgun. State's Exhibit 53 was a .40-caliber weapon and the 9-mm magazine found a few feet away did not go with that gun. Across the street and one block up, they found gloves in the driveway at 535 Rosa Avenue. The areas where he found the evidence on Rosa Avenue were not littered with other debris, trash, or clothes.

JPSO Deputy Edward Urquhart testified that on March 5, 2017, he canvassed the area around North Service Road and Andrews Avenue. During his canvassing, he found a knit cap in front of 556 Andrews Avenue. There were no other articles of clothing lying around.

JPSO Deputy Sean Thompson testified that on March 5, 2017, he went to the vicinity of Toulouse Street and Andrews Avenue. After a few minutes, a call came out over the radio with regard to a suspicious person at 560 Andrews Avenue. He got in his vehicle and went to that location, which he stated was actually at 564 Andrews Avenue. He went into the backyard, searched behind the house, and saw a shed. He found a hooded jacket and a backpack containing two gloves, a 9-mm

---

[7] Deputy Webster also identified the bullets in the magazine, pointing out that the magazine was extended, meaning that it held more bullets than a normal magazine.

firearm, and a face mask shoved behind the shed.  There was an unspent casing in the chamber of the firearm.  A blue glove and a gray t-shirt were also found in the area near the backpack by the shed.

Deputy Thompson testified that while canvassing, they found a video surveillance camera at 556 Andrews Avenue.  The camera, which was pointed at the alleyway of the back and side yards, captured two individuals coming under the carport.  The individuals were observed "fiddling around with some things," after which the individuals went towards the backyard.  The start time of 9:25 p.m. on the video was incorrect, as police records showed that he found the surveillance video at 9:17 p.m.  In the foreground of the video, the individual in the gray shirt was carrying a backpack, the same one later recovered from behind the shed at 564 Andrews Avenue.  In the final scene of the video, there were two individuals jumping over a fence at 556 Andrews Avenue.  The surveillance video from 556 Andrews Avenue depicted defendant and Phillip Brenckle, Jr. under the carport.  A few days later, a bundle of zip ties was found at 552 Andrews Avenue.  A 9-1-1 call was received on the night of the burglary from 560 Andrews Avenue and the caller said she could hear men talking along the side of her house and "jumping fences" through her backyard.

Lieutenant Kirt Arnold of the East Jefferson Levee District Police Department testified that on March 5, 2017, as he was responding to a call for a perimeter to be set up in the Oaklawn Drive area, another call came in from 614 Martin Behrman Walk of a suspicious person ringing a doorbell.  The doorbell had a camera, which showed a young black male, who was out of breath, continuously ringing the doorbell.  The individual in the video ringing the doorbell was identified as Wendell Garcia.[8]

---

[8] The video of this young male ringing the doorbell was shown to the jury.  Detective Gary Kessel testified that in the ring camera surveillance video, the individual could be heard

JPSO Detective Kinder Henry testified that on March 5, 2017, he responded to the intersection of Toulouse Street and Focis Street, which he stated was three blocks from the 400 block of Oaklawn Avenue, in order to set up a perimeter. Initially the JPSO thought they were looking for two white males, but a few minutes later, JPSO Sergeant David Roddy stated over the radio that they were looking for one white male and one black male.

Emily Terrebonne, a firearms examiner for the JPSO crime lab, was accepted as an expert in the field of firearms and toolmark examination. She testified that the Winchester .40-caliber fired cartridge casing found in the driveway of 415 Oaklawn Avenue was fired from the pistol found underneath the car at 530 Rosa Avenue.

Marcella Zozaya was accepted as an expert in the field of forensic DNA analysis for the JPSO DNA lab. She testified that she analyzed evidence in the instant case. She received buccal swabs from Wendell, Damon, defendant, Phillip Brenckle, Jr., and a man named "Jammario Hensley."[9] On March 6, 2017, CODIS (Combined DNA Indexing System) returned hits on several items for Wendell, Hensley, and defendant. Her testing of the black ski mask found at 530 Rosa Avenue indicated that Wendell was the major contributor to the DNA profile. Her testing of the gloves found in the driveway at 535 Rosa Avenue indicated that Wendell was the major contributor to the DNA profile. Her testing of the knit cap found in front of 556 Andrews Avenue indicated that defendant was the major contributor to the DNA profile. Her testing of the glove found in the backyard of

jiggling the door and breathing heavily. He also testified that the individual was out of breath, sweating, and wiping his face.

[9] Elaine Schneida, who was qualified as an expert in the field of DNA analysis, testified that she was the technical reviewer for Ms. Zozaya's tests and procedures and she agreed with Ms. Zozaya's results.

564 Andrews Avenue indicated that defendant was the major contributor to the DNA profile.[10]

JPSO Detective Gary Kessel testified that he was the lead investigator in the instant case. After reviewing the evidence, the JPSO arrested defendant, Wendell Garcia, Phillip Brenckle, Jr., and Phillip Brenckle, Sr.

Wendell testified at trial that he was twenty years old, had a prior conviction for aggravated escape from a juvenile center, for which he said he believed that he had received a six-year sentence. Subsequently during his testimony, he pleaded "the fifth." The trial judge told him that he could not plead "the fifth" once he had been sentenced. Wendell stated that he was not going to talk about March 5, 2017. The prosecutor was then allowed to treat Wendell as a hostile witness. Wendell asserted that on March 5, 2017, he did not do anything. He did not see himself in the video taken on that date on Martin Behrman Walk. He claimed that he was not in Metairie that day.

Wendell testified that on February 26, 2018, he gave a taped statement to the police in the presence of his mother and his attorney. He claimed that his attorney made him say that he shot someone on Oaklawn Avenue on March 5, 2017. He identified the plea agreement that he signed and the transcript of the guilty plea taken on March 27, 2018. He acknowledged that he pled guilty to aggravated burglary and received a twenty-five-year sentence in the instant case. He admitted that when he pled guilty, he stated that everything he said on February 26, 2018 was true. Wendell admitted that the person in the video on Martin Behrman Walk ringing the doorbell was him.

---

[10] Ms. Zozaya also stated that her testing of the black hat/baseball cap indicated that Hensley could not be excluded as a major contributor. However, Wendell, in his statement, and Damon, in his testimony at trial, stated that Hensley was not involved in the instant offense.

Wendell claimed that his brother, Damon, came and picked him up in a red Nissan on the day in question. He denied getting into his father's vehicle with his brother. His brother brought him to Metairie in a red car, which was different from what he had said in his February 26 statement. His attorney told him what to say in his statement. His attorney also told him that it was in his best interest to say that he shot someone.

Wendell explained that he went with Damon to the Burger King in Metairie to buy something to eat, but they did not eat. He was with Damon and a "white guy" at the time. He and Damon got into a verbal argument, after which he (Wendell) walked away. He knocked on a door and rang the doorbell on Martin Behrman Walk to "get a phone," but they did not answer the door, so he left. Afterwards, his friend, Ace, came and picked him up. He denied wearing a mask or gloves. He did not know how his DNA got onto the gloves that were found across the street from the gun that shot someone. He did not remember telling the State prior to his trial on the morning of February 26, 2018 that he shot someone on Oaklawn Avenue and wanted to go to the detective bureau to tell the truth.

JPSO Lieutenant Donald Meunier testified that on February 26, 2018, he assisted in transporting Wendell to the detective bureau, after which he and JPSO Sergeant Tommy Gai took Wendell's statement.[11] During his statement, Wendell's mother and his attorney were present. Wendell stated that he was aware that his plea agreement depended upon him being truthful.

In his statement, Wendell explained that in March 2017, he received a phone call from his father (defendant), who asked Wendell to take a ride. Defendant came to his residence on Valentine Court in a tan GMC Yukon, his brother, Damon, was driving, defendant was in the front passenger seat, and "Phil" and

---

[11] Although the CD containing the statement is marked as sealed, it was admitted and played at trial.

another white male were in the backseat. "Phil" was a young, skinny white male whom he had just met; he did not know the other white male. They picked him up about one hour before the shooting on Oaklawn Drive. "Phil" gave him a white mask and gloves and they drove to Oaklawn Drive. When they arrived, he, "Phil," and defendant put their masks and gloves on and exited the vehicle. "Phil" and defendant had guns with them when they got out of the car. He brought a Glock gun with him.

Wendell said that "Phil" and defendant went inside the house, while he (Wendell) stayed outside and watched. Damon and the other guy left in the car. "Phil" said that he was going to pretend to buy marijuana, but would then steal it. He believed that the door to the house was already open and defendant and "Phil" went inside. A "white guy" later ran outside, he fired the gun three times at the "white guy," and he (Wendell) ran away afterwards into the neighborhood. He disposed of the gun, the mask, and the gloves. He rang the doorbell at a house because he needed a phone to call someone to come and pick him up. No one answered the door, so he used the phone of someone who was walking in the neighborhood to call Hensley to come and give him a ride.

Wendell insisted that Hensley was not part of the plan to rob the house and Hensley was not present at the time of the offense. Hensley's DNA may have been on the hat found in the neighborhood because they shared clothes. Hensley and a woman later came and picked him up. He denied seeing the police. It was his father's idea to rob the victims of their marijuana. A couple of days later, his father told him that his (Wendell's) picture was on nola.com. "Phil" knew the men in the house on Oaklawn Drive and "Phil" was supposed to buy the marijuana. He denied ever meeting "Phil's" father. He did not dispose of an extra magazine in the neighborhood and no one else ran with him. He then admitted that he had

19-KA-77                                      13

brought two guns (a Glock and an "FNH" pistol) with him that night and he disposed of both guns containing clips in the neighborhood while he was running.

Detective Kessel testified that based on Wendell's statement, he obtained a search warrant for 409 Oaklawn Drive. The search warrant was later executed, during which they found hallucinogenic mushrooms, marijuana, and cocaine. After they spoke to Wendell, they obtained an arrest warrant for his brother, Damon.

Damon testified at trial that he was twenty-three years old, defendant was his father, and he had been in jail for the past five years after pleading guilty to accessory after the fact with respect to the aggravated burglary in the instant case. On March 5, 2017, he went to his father's house where he drank daiquiris and then fell asleep. At approximately 4:00 or 5:00 p.m., his father woke him up and told him to take a ride with him. He drove to Marrero in defendant's truck, a gold Suburban, and defendant was in the front passenger seat. He had just gotten his driver's license; defendant's driver's license was suspended. Defendant gave him directions to Meyers Street in Marrero.

When they arrived on Meyers Street, defendant went into the house and returned with two unknown white males, one of whom he later learned was named "Phillip." Damon's father told him they were going to pick up his brother, Wendell. He picked up Wendell and Phillip told him to get on the Crescent City Connection and go to Metairie. Once they got to Metairie, Phillip pointed out a house and said, "I think that's it right there." Phillip opened his backpack, removed a couple of masks and gloves, and passed them around the car. He did not get a mask or gloves, but thought that defendant got a mask and gloves. He saw the butt of a gun come out of the backpack and defendant had a gun on his hip.

Damon testified that Phillip and defendant told him that he was going to drop them off and someone else was going to pick them up. He "made the block,"

dropped off defendant, Phillip, and Wendell, and went to get something to eat. Phillip took the backpack with him when he exited the car. Before he left, they told him that they were going to call him to come back and pick them up. He and one of the "white guys" went to Burger King, but the system was down so they left. The "white guy" told him that he heard gunshots on the other side of Veterans, not where they dropped off everyone. His phone rang and Phillip was on the line. Afterwards, he jumped in the car, pulled off, circled the block, and went to where he dropped them off.

Damon testified that he did not know where to go, but since the car made loud noises, Phillip and defendant were able to guide him while on the phone. He picked up Phillip and defendant a couple of streets over from where he had dropped them off, noting that Wendell was not with them. They were coming from a driveway, did not have masks or gloves on, and Phillip did not have the backpack with him. He pulled off, got onto a bridge, took the next exit, and arrived at Target on Veterans. He told Phillip and defendant that he was going back to look for Wendell and to get out of the car.

Damon testified that he left and went back to the same area where he originally dropped the three men off. He saw the police and then got a call from Wendell telling him to come pick him up at a pizza place on Veterans. He started going back to Target, but hit a curb and his tire blew out. He called defendant to tell him that he would pick him up after he fixed the tire. He pulled up to the Circle K to put air in his tire and defendant and Phillip came to the Circle K. They called someone to either bring him a tire or give them a ride. They walked to Popeye's to get something to eat. Phillip's father came, they all got into the car, and they started driving home.

Damon testified that they went to Phillip's father's house on Meyers Street where he had picked up Phillip and the other "white guy" earlier. He dropped

Phillip's father off and everyone went their separate ways. The mother of his child picked him up and took him home. The next morning, he was awakened by a phone call, after which he looked on nola.com and saw Wendell's picture. He called Wendell, picked him up, and brought him to his house. However, Wendell then called someone to come and pick him up. The U.S. Marshals came to his house looking for Wendell, but Wendell was not there. The U.S. Marshals were not looking for him. After the U.S. Marshals left, he called defendant, who told him he was going to "handle it."

At some point, Damon learned that he was wanted, so he got his affairs in order and turned himself in. He told the detectives he did not want to talk to them, so they took him back to jail. At some point, the mother of his child helped him get in touch with the police. He gave a statement to the police approximately thirty days after the offense because he wanted to tell his side of the story and get home to his newborn baby.

Damon insisted that his childhood friend, Hensley, was not present on the night in question. He was charged with aggravated burglary, but entered into a plea agreement wherein his charge was reduced to accessory after the fact to aggravated burglary. He also acknowledged that he had a prior conviction for aggravated assault with a firearm, that his probation was revoked, and that he received a five-year sentence to run concurrently with his sentence in the instant case.

Detective Kessel testified that they arrested Hensley and spoke to him; however, Hensley was not charged in the instant case because he had a solid alibi. Based on Damon's statement, Detective Kessel obtained surveillance video from the Circle K at Clearview and Veterans, which was played for the jury. The video showed a gold or brown Yukon or Suburban vehicle being driven in and parking, after which four men exited the vehicle and moved to the south. Detective Kessel

learned that the vehicle belonged to either defendant or his girlfriend and that they both used it. He also obtained video surveillance from the Walgreens next door to the Circle K which had a time stamp of 9:04, and was played for the jury. The Walgreens video showed a group of individuals walking out of the Circle K parking lot. He obtained a photograph from the ALPR (Automated License Plate Reader) system of Phillip Brenckle, Sr.'s vehicle at Clearview and I-10 that was taken at approximately 9:00 p.m. that evening.

Additionally, Detective Kessel testified that they obtained a search warrant for defendant's vehicle. During the execution of the search warrant, they found a piece of paper, in some clothing, with a phone number on it. JPSO also obtained a search warrant for the vehicle that Phillip Brenckle, Jr. was driving at the time of his arrest. They found gloves rolled up on the floorboard inside that vehicle and those gloves were similar in construction and appearance to gloves recovered from the crime scene. They also seized a binder with Phillip Brenckle, Jr.'s name on it and inside that binder was the same phone number found on the piece of paper in defendant's vehicle. This phone number belonged to Phillip Brenckle, Sr.

After the State rested its case, the defense called several witnesses. Detective Ralph Dunne of the Gretna Police Department testified that he did not have any involvement in the investigation of the March 5, 2017 shooting, but was involved in the issuance of a search warrant for 315 Ninth Street in Gretna. Hensley and Wendell were associated with the home, but both subjects were gone by the time he arrived. Detective Dunne assisted the JPSO in executing the search warrant at Hensley's house. During the search, a 9-mm handgun, narcotics, ammunition, clothing, an iPhone, mail, and receipts were seized and then logged into evidence at the Gretna Police Department.

Danny Keating testified that he was a licensed practicing attorney in Louisiana and had handled personal injury claims for defendant and his wife,

settling the case in 2017, with defendant receiving $165,000, and his wife $1.25 million.

Damon testified that he spoke to Whitney Craft, the mother of his child, during a jailhouse phone conversation during which he said he did not "give a f*ck" about his father. He claimed that was not true and it was an emotional moment. He was hanging out in the jail yard with Hensley right before he talked to Ms. Craft. When he got to jail, he found out that Wendell and his father had implicated him as being present and participating in the robbery. He asked Ms. Craft to call Detective Kessel because he wanted to give his side of what happened on the night in question.

## ASSIGNMENT OF ERROR NUMBER THREE[12]

### *Sufficiency of the evidence*

In this assignment of error, defendant argues that the evidence was insufficient to support his aggravated burglary conviction. He contends that none of the victims identified him as a perpetrator in this offense, either in a lineup or at trial. Defendant contends that the victims testified that both entrants to the house wore masks, so they were unable to see anyone's face. He points out that the victims determined that one intruder was black and the other one was white. Defendant further asserts that although surveillance video footage showed that he

---

[12] When the issues on appeal relate to both the sufficiency of the evidence and one or more trial errors, the reviewing court should first determine the sufficiency of the evidence by considering the entirety of the evidence. *State v. Hearold*, 603 So.2d 731, 734 (La. 1992). The reason for reviewing sufficiency first is that the accused may be entitled to an acquittal under *Hudson v. Louisiana*, 450 U.S. 40, 101 S.Ct. 970, 67 L.Ed.2d 30 (1981), if a rational trier of fact, viewing the evidence in accordance with *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), in the light most favorable to the prosecution, could not reasonably conclude that all of the essential elements of the offense have been proved beyond a reasonable doubt. *Id.* Alternatively, the accused could be entitled to a reduction of the conviction to a judgment of guilty of a lesser and included offense. *Hearold, supra* (citing La. C.Cr.P. art. 821; *State v. Byrd*, 385 So.2d 248 (La. 1980)). When addressing the sufficiency of the evidence, consideration must be given to the entirety of the evidence, including inadmissible evidence which was erroneously admitted, to determine whether the evidence is sufficient to support the conviction. *Id.* at 734. *See also State v. Griffin*, 14-251 (La. App. 5 Cir. 3/11/15), 169 So.3d 473, 483.

was near the scene and was with Phillip Brenckle, Jr., the evidence did not definitively prove that he participated in the burglary. He states that the timestamp on the video footage showing him was incorrect and it was not proven exactly when the footage was captured.

Defendant acknowledges that his DNA was found on a black knit cap found near the scene; however, he argues it is reasonable to find that one of the individuals riding in his vehicle could have easily grabbed his knit cap before exiting the car. He submits that the State did not rule out the reasonable hypothesis that he arrived near the scene to look for his sons after the incident. Defendant argues that the statements of Wendell and Damon should be looked upon with great caution because they vary and both men pleaded guilty to garner a plea deal with the State.

The State responds that the evidence was sufficient to support defendant's conviction of aggravated burglary. The State further responds that while Damon's testimony alone was sufficient to convict, other evidence corroborated defendant's guilt, including his DNA found on a knit cap and a glove near the scene in the area of Andrews Drive, his presence near the scene of the crime in the area of Andrews Drive captured on surveillance video footage, the 9-1-1 call that two men were in the area of Andrews Drive talking and jumping fences outside, and Wendell's pretrial statement, which it states is admissible as substantive evidence of guilt notwithstanding Wendell's inconsistent trial testimony.

The constitutional standard for testing sufficiency of the evidence, as enunciated in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), is whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Ortiz*, 96-1609 (La. 10/21/97), 701 So.2d 922, 930, *cert. denied*, 524 U.S. 943, 118 S.Ct. 2352, 141 L.Ed.2d 722

(1998); *State v. Scott*, 06-134 (La. App. 5 Cir. 7/25/06), 939 So.2d 462, 470, *writ denied*, 06-2133 (La. 3/30/07), 953 So.2d 61.   Under the *Jackson* standard, a review of a criminal conviction record for sufficiency of the evidence does not require the court to ask whether it believes that the evidence at trial established guilt beyond a reasonable doubt.  *State v. Flores*, 10-651 (La. App. 5 Cir. 5/24/11), 66 So.3d 1118, 1122.  Rather, the reviewing court must decide, after viewing the evidence in the light most favorable to the prosecution, whether any rational trier of fact could have found the defendant guilty beyond a reasonable doubt.  *Id.  See also Jackson*, 443 U.S. at 319, 99 S.Ct. at 2789; *Ortiz*, *supra*.

Evidence may be either direct or circumstantial.  *Flores*, *supra*. Circumstantial evidence consists of proof of collateral facts and circumstances from which the existence of the main fact can be inferred according to reason and common experience.  *Id.*; *State v. Williams*, 05-59 (La. App. 5 Cir. 5/31/05), 904 So.2d 830, 833.  When circumstantial evidence is used to prove the commission of an offense, La. R.S. 15:438 provides that "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." *State v. Wooten*, 99-181 (La. App. 5 Cir. 6/1/99), 738 So.2d 672, 675, *writ denied*, 99-2057 (La. 1/14/00), 753 So.2d 208.  This is not a separate test from the *Jackson* standard, but rather provides a helpful basis for determining the existence of reasonable doubt.  All evidence, both direct and circumstantial, must be sufficient to support the conclusion that the defendant is guilty beyond a reasonable doubt.  *Id*.

Defendant was convicted of aggravated burglary in violation of La. R.S. 14:60, which provides, in pertinent part:

> A.  Aggravated burglary is the unauthorized entering of any inhabited dwelling, or of any structure, water craft, or movable where a person is present, with the intent to commit a felony or any theft therein, under any of the following circumstances:

(1) If the offender is armed with a dangerous weapon.

(2) If, after entering, the offender arms himself with a dangerous weapon.

(3) If the offender commits a battery upon any person while in such place, or in entering or leaving such place.

La. R.S. 14:67(A) provides the definition of theft:

A. Theft is the misappropriation or taking of anything of value which belongs to another, either without the consent of the other to the misappropriation or taking, or by means of fraudulent conduct, practices, or representations. An intent to deprive the other permanently of whatever may be the subject of the misappropriation or taking is essential.

La. R.S. 14:2(A)(3) provides that a "dangerous weapon" includes "any gas, liquid or other substance or instrumentality, which, in the manner used, is calculated or likely to produce death or great bodily harm." A gun used in connection with a robbery is, as a matter of law, a dangerous weapon. *State v. Mason*, 10-284 (La. App. 5 Cir. 1/11/11), 59 So.3d 419, 425, *writ denied*, 11-306 (La. 6/24/11), 64 So.3d 216. La. R.S. 14:33 provides, in pertinent part, that a "battery" is "the intentional use of force or violence upon the person of another[.]"

All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals. La. R.S. 14:24.

Encompassed in proving the elements of any offense is the necessity of proving the identity of the defendant as the perpetrator. When the key issue in the case is identification, the State is required to negate any reasonable probability of misidentification in order to carry its burden of proof under *Jackson*. *State v. Taylor*, 99-296 (La. App. 5 Cir. 7/27/99), 740 So.2d 216, 222, *writ denied*, 99-2609 (La. 3/17/00), 756 So.2d 322.

In the instant case, upon review, we find that a rational trier of fact could have found that the evidence was sufficient under the *Jackson* standard to support

defendant's conviction. For purposes of the instant case, aggravated burglary is generally defined as the unauthorized entering of an inhabited dwelling when a person is present with the intent to commit a felony or theft therein if the offender is armed with a dangerous weapon, arms himself with a dangerous weapon after entering, or commits a battery entering, while inside, or leaving. La. R.S. 14:60.

Here, Damon testified that he drove defendant, Phillip Brenckle, Jr., Wendell, and a white male to Oaklawn Drive, after which Phillip Brenckle, Jr. pointed to a house and said, "I think that's it right there." Damon further testified that he drove around the corner and defendant, Phillip Brenckle, Jr., and Wendell exited the vehicle while wearing masks and gloves and carrying guns. At trial, Wendell denied participating in the burglary; however, his prior statement was played for the jury, wherein he admitted that defendant and Phillip Brenckle, Jr. went inside the house, while he stood outside as a lookout. Wendell also admitted in his statement that he, defendant, and Phillip Brenckle, Jr. were wearing masks and gloves and armed with guns at the time. Wendell stated that at some point, a man ran out of the house and he shot at him three times before running away. He admitted that he disposed of his two guns, the mask, and the gloves in the neighborhood. He also admitted to ringing the doorbell of a house in an attempt to find a phone to call someone to pick him up. Surveillance video was admitted into evidence which showed Wendell ringing the doorbell. Further, Detective Kessel testified that the surveillance video from 556 Andrews Drive depicted defendant and Phillip Brenckle, Jr. under the carport after the offense. In his statement, Wendell said that it was defendant's idea to rob the victims of their marijuana and Phillip Brenckle, Jr. was going to steal the marijuana after pretending to buy it.

Mr. Brupbacher, Mr. Brassette, and Mr. Zometa testified that two armed men (one white and one black) came into their house. Mr. Brassette and Mr. Zometa recalled that the perpetrators were wearing gloves. They further testified

that the perpetrators told them to get on the ground and to empty their pockets. Mr. Brupbacher stated that he put his wallet containing $1,000 on the floor. He remembered that one of the perpetrators told the other one to tie them up, after which one of the perpetrators produced a bag with zip ties inside. Mr. Brassette testified that he gave the perpetrators eighty dollars and acknowledged having marijuana, cocaine, and "mushrooms" in his bedroom. Mr. Zometa explained that he had marijuana in his bedroom, but the perpetrators only took Mr. Brassette's money. Mr. Yerro testified that he was shot while running from the house during the incident.

Several JPSO deputies testified at trial regarding evidence that they recovered in the neighborhood after the incident, including a bullet casing, a hat/cap, a mask, a gun, an ammunition magazine, gloves, a backpack, a t-shirt, a knit cap, a hooded jacket, a 9-mm firearm, zip ties, and a face mask. The State's DNA expert stated that her testing of the black ski mask found at 530 Rosa Avenue and the gloves found in the driveway at 535 Rosa Avenue indicated that Wendell was the major contributor to the DNA profiles. The DNA expert also stated that her testing of the knit cap found in front of 556 Andrews Avenue and the glove found in the backyard of 564 Andrews Avenue indicated that defendant was the major contributor to the DNA profiles. The State's firearms expert testified that the Winchester .40-caliber fired cartridge casing found in the driveway of 415 Oaklawn Drive was fired from the pistol found underneath the car at 530 Rosa Avenue.

Defendant argues that the testimonies of Damon and Wendell were not credible since they both entered into plea deals with the State. However, the jury considered the testimony of the witnesses and made credibility determinations. The credibility of witnesses is within the sound discretion of the trier of fact, who may accept or reject, in whole or in part, the testimony of any witness; the

credibility of the witnesses will not be reweighed on appeal. *State v. Bartholomew*, 18-670 (La. App. 5 Cir. 10/23/19), 282 So.3d 374, 382, *writ not considered*, 19-1869 (La. 1/28/20), 288 So.3d 123. Absent internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. *State v. Washington*, 16-732 (La. App. 5 Cir. 4/12/17), 219 So.3d 1221, 1226.

In light of the foregoing, considering the evidence presented at trial, we find that a rational trier of fact could have found that the evidence was sufficient under the *Jackson* standard to support defendant's conviction of aggravated burglary. Further, the evidence shows that the State negated any reasonable probability of misidentification of defendant in order to carry its burden of proof under *Jackson*. This assignment of error is without merit.

## ASSIGNMENT OF ERROR NUMBER ONE

### *Denial of Motion to Continue the trial*

In this assignment of error, defendant argues that the trial court erred in denying his Motion to Continue the trial. He contends that on August 20, 2018, Damon pled guilty to the reduced charge of accessory after the fact of aggravated burglary pursuant to a plea agreement with the State with the understanding that he would testify against defendant at trial. Based on this development, as well as the need to obtain and analyze recorded jailhouse calls made by the co-defendants, defendant filed a Motion to Continue the trial on that date. He argues that due to the amount of material to be reviewed and the time needed to do so, the trial court erred by denying his Motion to Continue.

The State responds that defendant's August 20, 2018 request for a continuance was ultimately granted, and the trial was rescheduled for September 17, 2018. The State further responds that defendant failed to object or to seek

another continuance on September 17, 2018. As such, the State argues that this claim has not been preserved for review.[13]

The record reflects that on August 20, 2018, defense counsel filed a Motion to Continue the trial set for August 27, 2018, citing the need to discover information relative to Damon's plea agreement with the State, as well as to review an extensive amount of jailhouse calls made by Damon in order to determine the existence of possible exculpatory statements. He stated that he had filed two *subpoenas duces tecum* asking the trial court to order the Jefferson Parish Correctional Center to produce the jailhouse calls. As such, he asked the trial court to grant his Motion to Continue the trial.[14] On August 23, 2018, a hearing was held on defense counsel's Motion to Continue the trial. At the conclusion of the hearing, the trial court denied the continuance, after which defense counsel noted his objection.

At a hearing on August 27, 2018, defense counsel said that he had not received a return on his *subpoenas duces tecum*, after which the State withdrew its opposition to the Motion to Continue. The trial judge then continued the trial to September 17, 2018 to give defense counsel additional time to prepare for trial. Accordingly, defendant's Motion to Continue was, in fact, ultimately granted.

Defendant did not ask for another continuance on that date or lodge an objection to the continuance granted to September 17, 2018 under La. C.Cr.P. art.

---

[13] Alternatively, the State argues that the trial court did not err by denying the Motion to Continue on August 20, 2018, pointing out that it was not required to disclose Damon's plea agreement until trial under La. C.Cr.P. art. 717; Damon was anticipated to testify in accordance with his statement to the police on March 14, 2017, which had been turned over to the defense one year prior; the defense knew jailhouse calls were recorded and available; and the defense offered nothing more than speculation in the hope of finding helpful information in those phone calls.

[14] On August 21, 2018, the State filed an opposition to the Motion to Continue.

841.[15]  Accordingly, we find that this issue was not preserved for appellate review. This assignment of error is without merit.

## **ASSIGNMENT OF ERROR NUMBER TWO**

### *Erroneous admission of witness's pre-trial statement*

In this assignment of error, defendant argues that the trial court erred by admitting Wendell's pre-trial statement into evidence at trial.  He contends that Wendell's statement was introduced to the jury through the testimony of Lieutenant Meunier.  He asserts that when he objected to the statement based on *Crawford v. Washington*, *infra*, the trial court overruled him.  Defendant acknowledges that Wendell testified at trial and at no time was Wendell declared unavailable by the trial court.  He states that his trial counsel did not have a prior opportunity to cross-examine Wendell about his statement.

The State responds that there was no confrontation issue under *Crawford v. Washington* because Wendell testified at trial and was subject to cross-examination.  It further responds that it is irrelevant that Wendell's statement was played during Lieutenant Meunier's testimony, which was slightly later that same day after Wendell's testimony, citing *State v. Thompson*, 22-314 (La. App. 1 Cir. 1/10/23), 2023 WL 142384.  The State also responds that even if there was a confrontation violation, any error was harmless.

The record reflects that Wendell testified at trial that on February 26, 2018, he gave a taped statement in the presence of his mother and his attorney; however, he claimed that his attorney made him say that he shot someone on Oaklawn Drive on March 5, 2017.  Wendell testified at trial that he was not going to talk about March 5, 2017, he did not do anything on that date, and he was asserting his Fifth Amendment privilege not to testify.  The trial judge advised Wendell that he could

---

[15] La. C.Cr.P. art. 841(A) provides, in pertinent part: "An irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence."

not assert such a privilege since he had already been sentenced. Afterwards, Wendell testified regarding his activities on March 5, 2017, and he was subject to cross-examination. During his testimony, Wendell explicitly repudiated the statement that he had previously given to the police.

Later that day, Lieutenant Meunier testified that on February 26, 2018, he assisted in transporting Wendell to the detective bureau, after which he and Sergeant Gai took Wendell's statement. When the prosecutor offered the statement into evidence, defendant's trial counsel objected, stating:

> I need to note an objection clearly. The basis of the objection is the fact that, again, this is a - - in my opinion at least and you may well overrule me, but I've got to preserve my record - - a Crawford versus Washington hearsay situation. And I think under the circumstances, the State has not laid enough of a predicate with the prior witness; to wit, with respect to Wendell Garcia, to be able to justify the admission of this statement.
>
> There was in my opinion a procedure that could have been utilized in order to get the statement into evidence. The State chose not to do so; and, therefore, I'm lodging my objection in order to protect my record.

Afterwards, the trial judge overruled the objection and admitted Wendell's statement into evidence, which was played for the jury.

The Sixth Amendment to the United States Constitution and Article I, § 16 of the Louisiana Constitution guarantee an accused in a criminal prosecution the right to confront witnesses against him. *State v. Jackson*, 03-883 (La. App. 5 Cir. 4/27/04), 880 So.2d 841, 852, *writ denied*, 04-1399 (La. 11/8/04), 885 So.2d 1118. In *Crawford v. Washington*, 541 U.S. 36, 53-54, 124 S.Ct. 1354, 1365, 158 L.Ed.2d 177 (2004), the United States Supreme Court held that the Confrontation Clause bars "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had a prior opportunity for cross-examination." The Supreme Court also stated, "[W]e reiterate that, when the declarant appears for cross-examination at trial, the

Confrontation Clause places no constraints at all on the use of his prior testimonial statements." *Id.*, 541 U.S. at 59 n.9, 124 S.Ct. at 1359 n.9.

In *Thompson*, *supra*, cited by the State, the Louisiana First Circuit Court of Appeal found that the witness's prior inconsistent statement was admissible for its substantive value pursuant to La. C.E. art. 801(D)(1)(a), and the admission of the witness's prior statement did not violate the defendant's right to confront his accusers even though the statement was admitted, through another witness, after the witness testified. The court further noted that nothing prevented the defendant from recalling the witness in order to cross-examine him about his prior statement.

Even if a defendant's right to confrontation was violated, such a violation is subject to a harmless error analysis. *State v. Payne*, 17-553 (La. App. 5 Cir. 10/17/18), 258 So.3d 1015, 1023, *writ denied*, 18-1932 (La. 4/15/19), 267 So.3d 1122. An error is harmless when the guilty verdict was surely unattributable to the error. Whether an error is harmless in a particular case depends upon many factors, including: (1) the importance of the witness's testimony; (2) whether the testimony was cumulative in nature; (3) whether corroborating or contradictory evidence regarding the major points of the testimony existed; (4) the extent of cross-examination permitted; and (5) the overall strength of the State's case. *Id.*

In the instant case, we find that Wendell was available at trial since he was subject to cross-examination and answered questions regarding his previous statement. As such, Wendell's statement was properly admitted during Lieutenant Meunier's testimony. *See Crawford v. Washington*, *supra.* Further, in the instant case, just like in *Thompson*, *supra*, nothing prevented defendant from recalling Wendell in order to cross-examine him about his prior statement. Nevertheless, even if Wendell's statement was improperly admitted into evidence, any error was harmless since Wendell's statement was cumulative in nature. Damon testified that he drove Wendell, defendant, and Phillip Brenckle, Jr. to Oaklawn Drive

where Phillip Brenckle, Jr. pointed out a house and said, "I think that's it right there." Damon further testified that he "made the block," after which Wendell, defendant, and Phillip Brenckle, Jr. exited the vehicle wearing masks and gloves and carrying guns. Damon asserted that he later picked them up and when he did so, they were not wearing masks or gloves. The State presented expert testimony indicating that Wendell and defendant's DNAs were found on items scattered nearby. In light of the totality of the evidence, excluding Wendell's statement, the jury could have found that defendant either committed aggravated burglary or he was a principal to aggravated burglary.[16] This assignment of error is without merit.

## ASSIGNMENT OF ERROR NUMBER FOUR

### *Denial of motion to reconsider enhanced sentence based on excessiveness*

In this assignment of error, defendant argues that the trial court erred in denying his motion to reconsider his forty-five-year enhanced sentence, arguing that the sentence is excessive in light of the facts of this case and his role in the offense. However, this assignment of error is pretermitted by our finding of a patent error in the habitual offender adjudication, as discussed below.

## ASSIGNMENT OF ERROR NUMBER FIVE

### *Denial of Motion for New Trial*

In this assignment of error, defendant argues that the trial court erred when it denied his original Motion for New Trial. He contends that his motion listed seven grounds as bases for a new trial, the first being that the verdict was contrary to the law and the evidence.

Defendant argues that the State did not prove that he was present for the burglary at 409 Oaklawn Drive, or that he was one of the perpetrators who broke into the home and demanded money or other items from the victims. He maintains

---

[16] *See* Assignment of Error Number Three for a more thorough discussion of the sufficiency of the evidence.

that for these reasons and for the errors committed by the trial court, he is deserving of a new trial. Defendant did not brief the other six grounds for his Motion for New Trial in this assignment of error.

The State responds that to the extent defendant challenges sufficiency of the evidence, that claim was already made in another assignment of error. It further responds that when a motion for a new trial is based on the verdict being contrary to the law and the evidence, there is nothing for this Court to review. The State also contends that to whatever extent defendant seeks to have this Court address any other issues in his Motion for New Trial, he has not briefed those issues. It also points out that the other issues were not briefed in defendant's Motion for New Trial either. As such, the State argues that the other issues are abandoned.

Defendant filed two Motions for New Trial on October 18, 2018. The first one was based on La. C.Cr.P. art. 851. He did not, however, delineate which section or sections of the statute his motion was based on. In his motion, defendant listed the following reasons why he should be granted a new trial:

1. The verdict is contrary to the law and the evidence.

2. The Court respectfully erred in the denial of the Batson challenge.

3. The Court respectfully erred in the denial of the Motion for Mistrial after a sworn juror (Cardozo) failed to return for the trial.

4. The Court respectfully erred in allowing the admission of the hearsay statement of Wendell (Crawford v. Washington).

5. The Court respectfully erred in the denial of the Motion for Mistrial regarding references made by attorney Martin Regan during Wendell Garcia's police statement. The reference concerned alleged Obstruction of Justice by Damon Stephney.

6. The defendant was denied the opportunity to present a complete defense at trial due to the prohibition of publication of Damon Stephney's police statement.

7. The State respectfully failed pre-trial to disclose issues regarding the JPSO DNA Laboratory. The JPSO was forced to retest over 60 DNA samples in open criminal cases due to lab error. The State should have provided this information to the defense prior to trial. The Court erred in the denial of the Motion for Mistrial due to failure to disclose.

Defendant did not brief any of these arguments in his Motion for New Trial.

Also on October 18, 2018, defendant filed "Motion for New Trial and Motion for Judgment Notwithstanding Verdict." In that motion, defendant asserted that the State failed to prove beyond a reasonable doubt that he committed the aggravated burglary. He further asserted that the evidence established that other individuals were responsible based on their DNA found at the scene. Defendant argued that Louisiana law allowed a judge to enter a judgment of acquittal if the evidence viewed in the light most favorable to the State did not reasonably permit a finding of guilty. As such, he asked the trial court to grant his Motion for New Trial, and alternatively, to grant his Motion for Post-verdict Judgment of Acquittal.

A hearing was held on defendant's motions on October 22, 2018. During that hearing, defendant's trial counsel stated:

> Your Honor, at this particular time, there is a pending motion for new trial and also a motion [sic] judgment notwithstanding the verdict.
>
> Your Honor, what I indicated to this Honorable Court at the bench is what I normally do in this particular matter is encapsulate, that is, memorialize all the objections that were made in connection with the actual trial in connection with this particular case.
>
> Those objections, denials, motions for mistrial, etc are include [sic] within the motion for new trial in connection with this matter. I do realize the Court has ruled on those previously. However, in order to protect the record as far as Mr. Stephney is concerned, concerning the upcoming appeal in this matter, at this time, I am offering, filing, and introducing into evidence the entire record in connection to this particular case including all transcripts, bench conferences, and objections and motions for mistrial and denials of same.
>
> At this time, Your Honor, as to the motion for new trial and the motion with [sic] judgment notwithstanding the verdict, I submit the matter.

The prosecutor thereafter submitted on the testimony and the evidence adduced at the trial. The trial court subsequently denied both motions "[f]or the reasons ruled upon during the course of the trial[.]"

La. C.Cr.P. art. 851 provides the grounds for a new trial, in pertinent part, as follows:

> A. The motion for a new trial is based on the supposition that injustice has been done the defendant, and, unless such is shown to have been the case the motion shall be denied, no matter upon what allegations it is grounded.
>
> B. The court, on motion of the defendant, shall grant a new trial whenever any of the following occur:
>
> (1) The verdict is contrary to the law and the evidence.
>
> (2) The court's ruling on a written motion, or an objection made during the proceedings, shows prejudicial error.
>
> * * *
>
> (4) The court is of the opinion that the ends of justice would be served by the granting of a new trial, although the defendant may not be entitled to a new trial as a matter of strict legal right[.]

When a motion for a new trial is based on the verdict being contrary to the law and the evidence, there is nothing for review on appeal. *State v. Condley*, 04-1349 (La. App. 5 Cir. 5/31/05), 904 So.2d 881, 888, *writ denied*, 05-1760 (La. 2/10/06), 924 So.2d 163. However, both the Louisiana Supreme Court and this Court have addressed the constitutional issue of sufficiency of the evidence under this circumstance. *Id.*

The ruling on a motion for new trial is committed to the sound discretion of the trial judge and will not be disturbed on appeal absent an abuse of that discretion. *State v. Doyle*, 21-257 (La. App. 5 Cir. 12/22/21), 335 So.3d 393, 429, *writ denied*, 22-167 (La. 4/5/22), 335 So.3d 836.

In the instant case, in this assignment of error, defendant did not brief any of his seven reasons as to why he is entitled to a new trial. However, in Assignment of Error Number Three, defendant argued that the evidence was insufficient to support his conviction, which is very similar to his argument in this assignment of error that the verdict was contrary to the law and the evidence. Also, in Assignment of Error Number Two, defendant argued that the admission into

evidence of Wendell's pre-trial statement was in error. Both of these assignments were fully addressed, and defendant's arguments therein were found to be without merit. As such, the trial court did not abuse its discretion by denying the Motion for New Trial as to whether the verdict was contrary to the law and the evidence and as to the admission of Wendell's pre-trial statement.

As to the other reasons that his Motion for New Trial is based on, defendant has not briefed them. Under Uniform Rules–Courts of Appeal, Rule 2-12.4(B)(4),[17] any assignment of error or issue for review which has not been briefed is considered abandoned. *See Diaz*, *supra*. Restating an assigned error in brief without argument or citation of authority does not constitute briefing. *State v. Marie*, 07-397 (La. App. 5 Cir. 11/27/07), 973 So.2d 780, 781. In his brief, defendant does not present argument and fails to cite to any legal authority in support of his positions.[18] This assignment of error is without merit.

## SUPPLEMENTAL ASSIGNMENT OF ERROR

### *Denial of Motion for New Trial based on newly discovered evidence*

In his supplemental assignment of error, defendant argues that the trial court erred by denying his Motion for New Trial based on newly discovered evidence. He contends that Damon sent letters to him after the trial wherein Damon admitted to lying about defendant's participation in the burglary. He further contends that Damon also expressed remorse in the letters for having done so. He argues that the letters are effectively a recantation of Damon's prior testimony. He argues that due to the lack of direct evidence against him, including the lack of any of the victims' ability to identify him as a perpetrator of this offense, these letters cast

---

[17] Uniform Rules–Courts of Appeal, Rule 2-12.4(B)(4) provides: "All assignments of error and issues for review shall be briefed. The court may deem as abandoned any assignment of error or issue for review which has not been briefed."

[18] Uniform Rules–Courts of Appeal, Rule 2-12.4(B)(3) provides: "The court may not consider the argument on an assignment of error or issue for review if suitable reference to the specific page numbers of the record is not made."

considerable doubt upon the verdict returned at trial. Defendant maintains that when the evidence is considered in the aggregate, excluding Damon's statement to the police and his testimony at trial, the State's showing does not amount to proof beyond a reasonable doubt. The State responds that the trial court did not err by denying defendant's Motion for New Trial based on Damon's highly suspicious recantation.

On September 19, 2019, defendant filed a Motion to Remand and request for a stay of his appeal in this Court, stating that he would be filing a Motion for New Trial. On September 20, 2019, defendant filed a Motion for New Trial based on newly discovered evidence (the letters) pursuant to La. C.Cr.P. arts. 851(B)(3) and 853. In that motion, defendant argued that after the trial, his son, Damon, sent him letters wherein he admitted to lying about defendant's participation in the burglary. He attached three letters to his motion. On October 3, 2019, this Court remanded the case to the district court for hearing and consideration of defendant's Motion for New Trial and stayed this appeal pending resolution of the Motion for New Trial.

On November 21, 2019, the State filed an opposition to the Motion for New Trial. The State asserted that defendant predicated his motion on (as of yet) unauthenticated letters that he allegedly received from his son, Damon. The State also asserted that the letters contained statements to the effect that Damon's testimony inculpating defendant was false and that Damon would recant that testimony in order to free defendant. It argued that nothing about Damon's recantation in the letters to defendant justified dispensing with the general rule that recantations are highly suspicious and a new trial should ordinarily not be granted on the basis of a recantation. The State maintained that the letters suggest Damon simply feels guilt about his father receiving a forty-five-year sentence and Damon wished to help his father.

In its opposition, the State further contended that other evidence corroborated defendant's guilt, including his DNA found on a knit cap and a glove near the scene in the area of the Andrews Drive burglary, his presence near the scene in the area of Andrews Drive captured on surveillance video footage, the 9-1-1 call reporting that two men were in the area of Andrews Drive talking and jumping fences outside, and the pre-trial statement of Wendell, which it argued was admissible as substantive evidence of guilt notwithstanding Wendell's inconsistent trial testimony. The State contended that defendant claimed that the State was unable to provide an accurate time for the surveillance video footage; however, the State argued that the 9-1-1 calls, the events of the crime, the presence of a backpack in the footage that appears consistent with one later recovered in the area, and the recovery of items in the area with defendant's DNA on them, clearly showed that the footage was from a time shortly after the crime.

In its opposition, the State also pointed out that although defendant argued that Hensley was not charged despite Hensley's DNA being on items found near the crime scene, Wendell explained in his statement that he and Hensley sometimes shared clothing. The State contended that the items of evidence listed above made up an interconnected web of proof corroborating each other and ultimately demonstrating defendant's guilt beyond a reasonable doubt. It concluded that while an evidentiary hearing should be held, the trial court should deny the Motion for New Trial, given the highly suspicious nature of recantations in general and given that Damon's recantation appears clearly driven by Damon's desire to help his father escape a forty-five-year prison sentence.

On February 6, 2020, defendant filed a Motion to Require Damon Garcia to Supply Exemplars of Handwriting and Prints to prove that Damon authored the letters. On July 26, 2021, in a written ruling with extensive reasons, the trial court denied the motion.

On July 6, 2023, the Motion for New Trial was heard. At that hearing, Wendell testified that Damon told him that he (Damon) lied when he testified at trial about defendant. He further testified that Damon's conscience was weighing on him and Damon wanted to know how Wendell felt about him. Wendell testified that Damon had sent him approximately ten letters while he (Wendell) was incarcerated. He also stated that Damon also sent him copies of letters that he (Damon) had sent to defendant. Wendell identified the letters Damon sent to defendant.[19] He stated that he recognized Damon's handwriting on those letters. Wendell testified that the writing on the third letter was different from the writing on the first two letters, but that Damon wrote all three letters. The State did not cross-examine Wendell. Defense counsel then submitted the matter with Wendell's testimony and the three letters.

At the conclusion of the hearing, the trial judge orally denied the Motion for New Trial based on newly discovered evidence, stating:

> Well, I do remember the trial and I am going to take judicial notice of it insofar as my findings in connection with my ruling on this motion.
>
> But this is not the first alleged recantation. Mr. Garcia, who testified today, Wendell Garcia, recanted his previous statement. He gave a statement to the police and then, when he came into court, he recanted it. And it was quite clear to me that he had been persuaded to do that by persons unknown. And he had been offered a plea agreement and then reneged on it and the State took appropriate - - well, not appropriate, but exercised their discretion to withdraw the plea agreement.
>
> And here we go with Mr. - - the other Mr. Garcia, Damon Garcia, who gave his testimony, got a very sweet deal, and then now that that's over with, he conveniently says, Well, I lied, and I want to help my dad. That just reinforces to me the law the Courts say that recantation require a whole lot of corroborating evidence. And I don't find that in this case. I really think that the Stephneys and the Garcias have tried to engineer this to result in this spectacle, which to me, amounts to a fraud on the laws, as they used to say, or, a fraud on the court. And the Motion for New Trial is denied for those reasons.

---

[19] These letters were ultimately admitted into evidence, but only for purposes of said hearing.

On September 11, 2023, this Court lifted the stay of defendant's appeal and allowed defendant time to file a supplemental brief limited to the issues raised in the Motion for New Trial based on newly discovered evidence. On October 17, 2023, defendant filed a supplemental brief in this matter raising this assignment of error.

La. C.Cr.P. art. 851(B) provides that the court, on motion of the defendant, shall grant a new trial whenever any of the following occur: "… (3) New and material evidence that, notwithstanding the exercise of reasonable diligence by the defendant, was not discovered before or during the trial, is available, and if the evidence had been introduced at the trial it would probably have changed the verdict or judgment of guilty. …"

La. C.Cr.P. art. 853(B) provides:

B. When the motion for a new trial is based on Article 851(B)(3) of this Code, the motion may be filed within one year after verdict or judgment of the trial court, although a sentence has been imposed or a motion for a new trial has been previously filed. However, if an appeal is pending, the court may hear the motion only on remand of the case.

La. C.Cr.P. art. 854 provides, in pertinent part:

A motion for a new trial based on ground (3) of Article 851 shall contain allegations of fact, sworn to by the defendant or his counsel, showing:

(1) That notwithstanding the exercise of reasonable diligence by the defendant, the new evidence was not discovered before or during the trial;

(2) The names of the witnesses who will testify and a concise statement of the newly discovered evidence;

(3) The facts which the witnesses or evidence will establish; and

(4) That the witnesses or evidence are not beyond the process of the court, or are otherwise available.

* * *

Additionally, the jurisprudence imposes the following four requirements for a motion for new trial based on new evidence: 1) the evidence must have been

discovered since the trial; 2) failure to learn of the evidence at the time of trial must not be due to defendant's lack of diligence; 3) it must be material to the issues at the trial; and 4) it must be of such a nature that it would probably produce an acquittal in the event of a retrial. *State v. Richoux*, 11-1112 (La. App. 5 Cir. 9/11/12), 101 So.3d 483, 489, *writ denied*, 12-2215 (La. 4/1/13), 110 So.3d 139. The trial court's determination as to whether these requisites are met is entitled to great weight, and its denial of a new trial will not be disturbed on appeal absent a clear abuse of that discretion. *Id.*

Recantations are highly suspicious, and except in rare circumstances, a motion for new trial should not be granted on the basis of a recantation since that disclaimer is tantamount to admission of perjury so as to discredit the witness at a later trial date. *State v. Bolden*, 03-266 (La. App. 5 Cir. 7/29/03), 852 So.2d 1050, 1064 (citing *State v. Clayton*, 427 So.2d 827, 830 (La. 1982)). Absent special circumstances, to refuse to grant a new trial on such a basis is not an abuse of discretion. *Clayton*, *supra*.

In *State v. Quang T. Do*, 13-290 (La. App. 5 Cir. 11/19/13), 130 So.3d 377, *writ denied*, 13-2907 (La. 6/20/14), 141 So.3d 285, the defendant was convicted of aggravated rape and other sexual offenses against juveniles. On appeal, the defendant argued that the trial court erred in denying his motion for new trial after the victim, O.D., recanted her allegations. This Court found that the trial court did not abuse its discretion by denying the motion for new trial, pointing out that the record supported the trial court's conclusion that O.D. fabricated her recanting testimony, O.D. admitted she did not want to see her father sent to jail for life, and O.D.'s recanting testimony was undermined by the un-recanted trial testimony of other individuals who corroborated parts of O.D.'s original testimony. *Id.* at 387-90.

In the instant case, we find that the evidence at trial established that defendant enlisted the help of his two sons, Damon and Wendell, to commit the subject aggravated burglary. After all of the perpetrators were arrested, Damon and Wendell entered into plea agreements and obtained favorable sentences. At trial, Wendell recanted his prior statement to the police. At the hearing on the Motion for New Trial based on newly discovered evidence, Damon's letters—which were admitted into evidence, but only for purposes of said hearing—appear to indicate that he desired to recant his prior testimony at trial. The letters are not dated.[20]

In his letters, Damon apologized to his father for lying about what had happened on the night of the incident. Damon asserted in his letters that defendant only came to the scene to help him and the other individuals. He stated that it was because of him that defendant was in prison. Damon told his father that he would be willing to serve a few more months in jail to help defendant, so that defendant would not have to serve forty-five years.

A review of Damon's letters indicates that he felt guilty about his father's receiving a forty-five-year sentence and he wanted to help defendant obtain a lesser sentence or be released from jail, similar to the victim in *Quang T. Do*, who recanted her testimony and admitted that she did not want to see her father sent to jail for life. Importantly, we find that there was other evidence in the instant case besides Damon's pre-trial statements and trial testimony, as thoroughly described above, that established defendant's guilt beyond a reasonable doubt, including

---

[20] Damon Garcia did not testify at the hearing on the Motion for New Trial. The record indicates that Damon Garcia asserted his Fifth Amendment right against self-incrimination and declined to testify at the hearing on the Motion for New Trial regarding the letters he ostensibly sent to Wendell and defendant. *See* February 6, 2020 minute entry.

DNA evidence, surveillance footage, and Wendell's pre-trial statement, among other things.[21]

In light of the foregoing, we find that the trial judge did not abuse his discretion by denying the Motion for New Trial based on newly discovered evidence. This assignment of error is without merit.

## ERRORS PATENT REVIEW

The record was reviewed for errors patent according to La. C.Cr.P. art. 920, *State v. Oliveaux*, 312 So.2d 337 (La. 1975), and *State v. Weiland*, 556 So.2d 175 (La. App. 5th Cir. 1990). Our review reveals two errors patent that require addressing.

### *Habitual offender adjudication*

We first find that there exists a patent error regarding the habitual offender cleansing period pertaining to defendant's habitual offender adjudication.[22] The State asserts in brief that at the sentencing, the State proceeded under the belief that a ten-year cleansing period governed, but for the following reasons, we find that the five-year cleansing period of La. R.S. 15:529.l(C)(l) applies in this case.

Prior to November 1, 2017, a ten-year cleansing period governed all habitual offender proceedings. However, Acts 257 and 282 of 2017, twin Acts which both went into effect on November 1, 2017, established two different cleaning periods: the "ordinary" cleansing period of five years found in La. R.S. 15:529. l(C)(l), and an "enhanced" ten-year cleansing period for crimes of violence and sex offenses, found in La. R.S. 15:529.l(C)(2).

Defendant's instant crime is aggravated burglary, a crime of violence as per La. R.S. 14:2(B)(20). Neither of defendant's predicate offenses (possession of

---

[21] *See also* Assignment of Error Number Three for a more thorough discussion of the sufficiency of the evidence.

[22] The State raised the issue of this possible patent error in its brief.

cocaine and obscenity) are crimes of violence. This Court has previously found that in this situation, the "five-year" cleansing period in La. R.S. 15:529.l(C)(l) applies, rather than the "ten-year" cleansing period in La. R.S. 15:529.l(C)(2). *See State v. Pike*, 22-113 (La. App. 5 Cir. 12/28/22), 355 So.3d 691, *writ denied*, 23-35 (La. 9/26/23), 370 So.3d 470.

The State argues in its brief that this Court should reconsider and abrogate its holding in *Pike*, citing principles of statutory construction and legislative history of Acts 257 and 282. The State argues in its brief that this Court's reading of the statute in *Pike* allows the trial court to "look forward" ten years from a predicate crime of violence, but not to "look back" ten years from an instant crime of violence. The State argues that because the current offense is a crime of violence, the ten-year cleansing period should apply.

In *State v. Pike*, this Court, citing *State v. Lyles*, 19-203 (La. 10/22/19), 286 So.3d 407, found that pursuant to the amendment to La. R.S. 15:529.1, for sentencing enhancement, where the *prior offense* was not a crime of violence or a sex offense, no more than five years may elapse between the "date of the commission of the current offense or offenses and the expiration of the correctional supervision, or term of imprisonment[.]" In that case, the State set forth a predicate offense of unauthorized use of a motor vehicle, which was neither a crime of violence as defined in La. R.S. 14:2(B), nor a sex offense as defined in La. R.S. 15:541. As such, this Court found that La. R.S. 15:529.1(C)(1) applied instead of La. R.S. 15:529.1(C)(2), and the applicable cleansing period was five years. Due to the State's failure to establish that the cleansing period had not lapsed and the lack of evidence in the record regarding the defendant's discharge date, this Court vacated the defendant's adjudication and sentence as a habitual offender, reinstated his original sentence on count one, and remanded the matter to the trial court for further proceedings. *Id.* at 694-96.

As previously noted, defendant's underlying crime is aggravated burglary. His two predicate convictions are possession of cocaine and obscenity; however, neither one of those offenses is a crime of violence as defined in La. R.S. 14:2(B), nor a sex offense as defined in La. R.S. 15:541. *State v. Pike* is the current state of the law in this Court, and therefore, is considered precedent in this Court. We respectfully decline the State's invitation and urging for this Court to reconsider and abrogate this Court's previous holding in *Pike* on this issue. As such, consistent with this Court's holding in *State v. Pike*, we find that the five-year cleansing period set forth in La. R.S. 15:529.1(C)(1) applies to the instant case, rather than the ten-year cleansing period set forth in La. R.S. 15:529.1(C)(2).

In light of the foregoing, because the State failed at the habitual offender hearing in this case to establish that the five-year cleansing period had not lapsed between defendant's possession of cocaine conviction and the date of the current offense, and because the State failed to prove at the habitual offender hearing in this case defendant's discharge date on the prior conviction for possession of cocaine, we vacate defendant's habitual offender adjudication and enhanced sentence. We reinstate defendant's original thirty-year sentence and remand the matter to the trial court for further proceedings. Since double jeopardy principles do not apply to sentence enhancements, the State may retry defendant as a habitual offender if it chooses to do so. *See State v. McClure*, 14-520 (La. App. 5 Cir. 11/25/14), 165 So.3d 998, 1005, *writ denied*, 14-2694 (La. 10/9/15), 178 So.3d 1001.

### *Post-conviction relief advisal*

Further, the record reflects an additional patent error: at sentencing, defendant was not advised of the provisions of La. C.Cr.P. art. 930.8. If a trial court fails to advise, or provides an incomplete advisal, pursuant to La. C.Cr.P. art. 930.8, the appellate court may correct this error by informing the defendant of the

applicable prescriptive period for post-conviction relief by means of its opinion. *State v. Becnel*, 18-549 (La. App. 5 Cir. 2/6/19), 265 So.3d 1017, 1021-22. Accordingly, we hereby advise defendant that no application for post-conviction relief, including applications that seek an out-of-time appeal, shall be considered if filed more than two years after the judgment of conviction and sentence has become final under the provisions of La. C.Cr.P. arts. 914 or 922.

## **DECREE**

For the foregoing reasons, defendant's conviction is affirmed; defendant's habitual offender adjudication and enhanced sentence are vacated; defendant's original sentence of thirty years at hard labor is reinstated; and the matter is remanded to the trial court for further proceedings.

**CONVICTION AFFIRMED; HABITUAL OFFENDER ADJUDICATION AND ENHANCED SENTENCE VACATED; ORIGINAL SENTENCE REINSTATED; REMANDED**

SUSAN M. CHEHARDY
CHIEF JUDGE

FREDERICKA H. WICKER
JUDE G. GRAVOIS
MARC E. JOHNSON
STEPHEN J. WINDHORST
JOHN J. MOLAISON, JR.
SCOTT U. SCHLEGEL
TIMOTHY S. MARCEL

JUDGES

CURTIS B. PURSELL
CLERK OF COURT

SUSAN S. BUCHHOLZ
CHIEF DEPUTY CLERK

LINDA M. WISEMAN
FIRST DEPUTY CLERK

MELISSA C. LEDET
DIRECTOR OF CENTRAL STAFF

(504) 376-1400
(504) 376-1498 FAX



FIFTH CIRCUIT

101 DERBIGNY STREET (70053)

POST OFFICE BOX 489

GRETNA, LOUISIANA 70054

www.fifthcircuit.org

## NOTICE OF JUDGMENT AND CERTIFICATE OF DELIVERY

I CERTIFY THAT A COPY OF THE OPINION IN THE BELOW-NUMBERED MATTER HAS BEEN DELIVERED IN ACCORDANCE WITH **UNIFORM RULES - COURT OF APPEAL, RULE 2-16.4 AND 2-16.5** THIS DAY **FEBRUARY 28, 2024** TO THE TRIAL JUDGE, CLERK OF COURT, COUNSEL OF RECORD AND ALL PARTIES NOT REPRESENTED BY COUNSEL, AS LISTED BELOW:

**CURTIS B. PURSELL**
CLERK OF COURT

## 19-KA-77

**E-NOTIFIED**
24TH JUDICIAL DISTRICT COURT (CLERK)
HONORABLE MICHAEL E. KIRBY, PRO TEMPORE (DISTRICT JUDGE)
HONORABLE FRANK A. BRINDISI (DISTRICT JUDGE)
DARREN A. ALLEMAND (APPELLEE)          THOMAS J. BUTLER (APPELLEE)          KATHRINE E. ELLIS (APPELLANT)
MARY V. HICKS (APPELLANT)

**MAILED**
JAMES A. WILLIAMS (APPELLANT)          HONORABLE PAUL D. CONNICK, JR.
JEFFREY HUFFT (APPELLANT)              (APPELLEE)
ATTORNEY AT LAW                        DISTRICT ATTORNEY
706 DERBIGNY STREET                    RACHEL L. AFRICK (APPELLEE)
GRETNA, LA 70053                       SETH W. SHUTE (APPELLEE)
                                       ASSISTANT DISTRICT ATTORNEYS
                                       TWENTY-FOURTH JUDICIAL DISTRICT
                                       200 DERBIGNY STREET
                                       GRETNA, LA 70053